UNITED STATES v. ROSENSTEIN (No. 394).[1]

1. FINDING OF FACTS BY THE COURT, WHEN.

Where there has been no authoritative finding of fact concurred in by a majority of the sitting members of the Board of General Appraisers, the question of fact is deemed open for determination here.

2. KIPPERED HERRING IN TIN CANS.

The words "herrings, kippered," in paragraph 272, tariff act of 1909, are construed with reference to the commercial meaning of those words at the time of the statute's enactment, and while it would appear there may have been occasional importations of kippered herring not in tins, the decided preponderance of the testimony here is that kippered herring are commonly imported in tins and can only be so imported during all seasons of the year, and "herrings, kippered," must be taken to refer to the fish in tin containers, and as such these are dutiable under paragraph 272 of said act.

United States Court of Customs Appeals, February 27, 1911.

APPEAL from decision of Board of United States General Appraisers, G. A. 7070 (T. D. 30794).

[Affirmed.]

D. Frank Lloyd, Assistant Attorney General (Charles D. Lawrence on the brief), for the United States.

McLaughlin, Russell, Coe & Sprague (Edward P. Sharretts, Rufus W. Sprague, jr., of counsel) for appellees.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

This case involves an importation of kippered herring in tin cans. The Board of General Appraisers held the importation dutiable under paragraph 272 of the tariff act of 1909, which reads as follows:

Herrings, pickled or salted, smoked or kippered, one-half of one cent per pound; herrings, fresh, one-fourth of one cent per pound; eels and smelts, fresh or frozen, three-fourths of one cent per pound.

---

[1] Reported in T. D. 31357 (20 Treas. Dec., 422).

The Government claims that they are dutiable under paragraph 270, which, after providing for fish packed in oil, etc., reads:

All other fish (except shellfish) in tin packages, thirty per centum ad valorem; fish in packages, containing less than one-half barrel, and not specially provided for in this section, thirty per centum ad valorem; caviar, and other preserved roe of fish, thirty per centum ad valorem.

Under prior tariff laws containing language somewhat similar to that employed in section 272, but not including the word "kippered," it was held in Johnson's case (56 Fed. Rep., 822), Kauffmann Bros. *v.* United States (99 Fed. Rep., 430), and in Benson *v.* United States (159 Fed. Rep., 118) that the term "fish in tin packages" more specifically described kippered herring than did the language then contained in the paragraph corresponding to 272.

The question first arose under the present statute in Vandegrift's case, G. A. 7007 (T. D. 30528). The Board of General Appraisers in that case held that the questions of law or fact were not identical with those passed upon in the cases above cited; that it was shown by the facts of that case and found as a fact that kippered herrings are not imported in any other way than packed in tins. In view of this it was held that the intent of Congress was clear, and that by the introduction of the words "kippered herring" it must be understood that Congress intended to refer to kippered herring in tins, and that this specific eo nomine provision should prevail over the provision for other fish in tins, as to adopt any other construction would render the provision for kippered herring a practical nullity.

The Government, being dissatisfied with this decision, prepared the present case, with the result that upon a hearing General Appraiser Chamberlain found that, as in the case of Vandegrift's case, it appeared that kippered herrings are not commercially imported except in tin cans, therefore the reasoning of that opinion should apply to this. General Appraiser McClelland, while neither affirming nor disaffirming this finding, agreed with his associate upon the ground that "herrings, smoked or kippered," appearing in paragraph 272, is more specific than paragraph 270, "all other fish in tin packages."

From this decision of the board the Government appeals. As there is no authoritative finding concurred in by a majority of the sitting members of the board, the question of fact is open for our determination here.

It becomes necessary for us to determine, therefore, whether kippered herrings were commercially imported in other than tin cans at the time of the enactment of the tariff act of 1909. We apprehend that the question to be decided is not whether an occasional importation might have been made in a fugitive way or under exceptional and

peculiar conditions, but whether in the ordinary course of the whole-sale trade kippered herrings in other than tin boxes could be and were imported.

The testimony on the part of the Government's witnesses will be briefly referred to. The first witness mentioned in the brief of the Government is William H. White, who was a dealer in poultry and game, and who testified that since the previous fall he had imported kippered herring. It appeared that he had only been dealing in kippered herring since the previous fall, his testimony having been taken in April, 1910, and that the herring imported were similar to Scotch herring, and were imported dry.

The next witness, Thomas Smith, testified that he had himself prepared kippered herring in this country, and when asked if he had imported kippered herring, replied:

Well, I can't say that I have, but they are imported.

He further testified that they are imported in boxes containing 45 to 50 in a box, and were sold to the trade in general. His information as to these fish being imported was that he secured them from a dock.

The next witness was John J. Page, who testified that he had imported kippered herring, but when asked what part of his business it was, testified that his business was mainly that of dealing in fresh fish; that his imported fish consisted of about 5 per cent of his business. When asked what proportion of this 5 per cent consisted of herrings, he replied that not over 1 or 2 per cent. This, it will be seen, is a very small percentage of the business transacted by this dealer. He also testified that he only imported them during the cool weather:

We probably begin in October, and we wind up about the end of April.

It further appeared that these fish were sold by him as smoked herring. He testified as follows:

Q. And those fish which you have referred to as the kippered herring are really a variety of smoked herring?—A. A smoked herring; that is what we call them.

Q. Do you sell them as smoked herring?—A. Sell them as kippers or kippered herring.

Q. Do you sell them as smoked herring?—A. If a man comes in and says he wants a smoked herring we give him these. * * * I would call it a smoked herring or kippered herring, either one.

It is not altogether clear from this testimony as to whether the importations made by this witness were, in the proper sense of the term, kippered herring. The testimony showed that a kippered herring is one salted and smoked only for a short time, about 20 hours. It is obvious that a herring may be so smoked as to make it capable of being shipped at any season of the year.

The testimony of L. H. Smith is somewhat similar.

It is to be noted that none of these witnesses dealt in kippered herring in large quantities. It is also noticeable that by the testimony offered by the Government it appears that kippered herring were not imported except during certain seasons of the year.

As opposed to this testimony there is the testimony of the importers' witnesses, who testified as to experiments in introducing kippered herring which have failed. Mr. Goldmark, who is a member of the importing firm, testified to having attempted to introduce kippered herring in boxes, and that a trial shipment of 50 boxes was brought in, was put in the refrigerator of the steamship, but notwithstanding this it was an unsuccessful experiment. He also describes the process by which the fish are prepared in Scotland. The witness said that they are split, the entrails removed, and the fish hung up in wooden houses and smoked lightly for about 20 hours; that they are then taken down, put in tins and hermetically sealed; that for consumption they are not put up in tins, but in boxes, and that none of these herring in boxes are exported to the United States; and that he would be very much surprised to know that any such were imported.

George H. Pearson, another importer called by the contestant, described the process of preparing kippered herring for market, and testified that in his opinion kippered herring could not be imported commercially except in tin cans. He answered the question: "Do you mean that it would not be practical or profitable to import them in any other way?" by saying: "I mean the method of curing the kippered herring is such that they are practically and positively a perishable article."

He testified that he had seen some herring that were brought here in boxes a long time ago and that the effort to bring them was a total failure, simply because the herring were perishable, and that therefore it was never considered practicable, commercially. Those herrings were brought here in a freezer as an experiment.

Seymour S. Mack, another witness for the importers, testified that the kippered herring imported by their firm was herring split and smoked, packed in a tin and hermetically sealed. He also testified, on cross-examination, that when engaged with another firm of Austin, Nichols & Co. an attempt was made to import 10 boxes of kippered herring, but when they arrived they were spoiled, and that was the first and last importation of them.

B. M. Shipman, a witness on behalf of the importers, testified that he was engaged as an importer of salt, canned, and dried fish, and was asked whether he had ever imported kippered herring in any way other than in tins. He replied that he had made several importations; that four years ago was his first one and February, 1910, was his last one; that these were very small and were in wooden boxes. When asked if he found it was commercially practicable to import them that way,

he answered that he did not. He found it absolutely impossible to import kippered herring and bring them in successfully unless they were embalmed. He further testified that in 1905 he brought over one box, but it was commercially a failure. It was absolutely slimy in 48 hours. The next importation he brought in a refrigerator, 100 boxes. In answer to the question whether that was commercially a success, he replied:

No; they were absolutely gone when I took delivery of them again—slimed, you know.

The next was an importation from Halifax, Nova Scotia, September, 1909, just after the tariff bill was passed. He then imported four or five boxes. He saw these boxes packed in Halifax, and when they arrived in New York they were slimy again. When asked if he could bring them in in wholesale quantities in a refrigerator, he answered:

No, sir; I will never bring in another one in any quantity or in any shape. I think it is impossible to do it unless you embalm them or dip them in boracic acid, which the Government I don't think would allow. The fresh fish, a kipper is a kipper; if it is heavy enough salted to be a bloater it will keep, but never as a kipper, because that is practically a fresh herring.

Q. The kippered herring, then, have less salt?—A. It is only washed in salt about five minutes to dry the blood out and cleanse it and give it a salt flavor.

In answer to the question, "How does that compare with the amount of salt used on the herring packed in boxes?" he replied, "That is a fish cured in salt."

This testimony is corroborated by Thomas Robertson, another importer, who testified to the effect that it is commercially impracticable to import kippered herring in boxes.

It is not altogether clear from the record that some of the Government's witnesses have not confused smoked herring with kippered herring. But however this may be, we think that the great preponderance of the testimony in this record shows that while occasional importations of so-called kippered herring in packages other than in tins have been made, the merchandise being sold for immediate consumption, to only certain classes of trade partaking more of the nature of retail transactions, importations of kippered herring in boxes is not commercially possible in the wholesale way, and that fugitive or occasional importations, confined to a particular season of the year, and in a small way, do not determine the commercial designation. See Sonn v. Magone (159 U. S., 417); Stewart v. United States (113 Fed. Rep., 928); Morrison v. Muller (37 Fed. Rep., 82); Dieckerhoff v. Robertson (44 Fed. Rep., 160); and Lamb v. Robertson (38 Fed. Rep., 716).

The decision of the Board of General Appraisers is *affirmed.*